**UNITED STATES DISTRICT COURT
DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX**

| | | |
|---|---|---|
| JAMILA RUSSELL and LAURITZ THOMPSON III, | | |
| Plaintiffs, | | Civ. No. 15-49 |
| v. | | |
| SUPERIOR COURT MARSHAL CHRISTOPHER RICHARDSON, IN HIS INIDIVIDUAL AND OFFICIAL CAPACITY; GOVERNMENT OF THE VIRGIN ISLANDS; and SUPERIOR COURT OF THE VIRGIN ISLANDS, | | OPINION |
| Defendants. | | |

THOMPSON, U.S.D.J.[1]

## INTRODUCTION

This matter comes before the Court on Motions for Summary Judgment brought by

Defendant Christopher Richardson (ECF No. 248) and Defendant Superior Court of the Virgin

Islands (ECF No. 251), joined by Defendant Government of the Virgin Islands (ECF No. 253).

Plaintiffs oppose. (ECF Nos. 257, 258.) The Court decides the Motions on the papers, without

oral argument. Fed. R. Civ. P. 78(b). As set forth herein, Defendant Richardson's Motion is

denied and Defendant Superior Court's Motion is granted in part and denied in part.

## BACKGROUND

This civil rights case arises from the shooting of an unarmed fifteen-year-old, Plaintiff

Lauritz Thompson ("Plaintiff Thompson"), by Defendant Christopher Richardson ("Defendant

---

[1] The Hon. Anne E. Thompson, United States District Judge for the District of New Jersey, sitting by designation.

Richardson"), Deputy Marshal for the Superior Court of the Virgin Islands ("Defendant Superior Court"). The Court takes judicial notice that, pursuant to Virgin Islands law, the Family Division of the Superior Court of the Virgin Islands (the "Family Division") governs, *inter alia*, matters involving persons in need of supervision under age eighteen and juvenile delinquency. *See* 4 V.I.C. § 172; *see also id.* § 176 (adopting definitions in 5 V.I.C. § 2502). Though the events at the heart of this case occurred on July 11, 2013, the Court briefly reviews events before that date for surrounding context. The following core facts are undisputed, unless otherwise noted.

In November 2012, Plaintiff Jamila Russell ("Plaintiff Russell") filed a Person in Need of Supervision ("PINS") Petition with the Family Division regarding her fifteen-year-old son, Plaintiff Thompson. (Def. Richardson's Statement of Material Facts ("SMF") ¶ 1, ECF No. 250; Def. Richardson's Ex. 2, ECF No. 250-2.)[2] On December 28, 2012, the parties in the PINS matter entered into a consent decree and the Family Division entered an order suspending the proceedings and placing Plaintiff Thompson under court supervision for six months. (Def. Richardson's Ex. 4, ECF No. 250-4.) On February 5, 2013, two misdemeanor juvenile delinquency matters regarding Plaintiff Thompson were opened in the Family Division. (*See, e.g.*, Def. Richardson's Exs. 7–10, ECF Nos. 250-7–250-10; *see also* Def. Richardson's Exs. 20, 21, ECF Nos. 250-20, 250-21.) In light of these matters, on March 4, 2013 the government moved to dismiss the preexisting PINS matter, choosing to "proceed under [the delinquency cases] where the minor can continue to receive counseling and supervision." (Def. Richardson's

---

[2] The parties dispute the relevance of these earlier events. (*See generally* Pls.' Resp. to Def. Richardson's SMF at 1, ECF No. 259 ("Paragraphs 1 through 7 of Defendant Richardson's Statement of Material Facts are irrelevant and immaterial to the issues raised in the Motion for Summary Judgment . . . .").) The Court provides a procedural skeleton but has omitted discussion of the underlying substantive allegations in the Family Division matters, both to protect the confidentiality required by these matters, which concerned a juvenile, and because they do not bear on the issues before the Court.

Ex. 12, ECF No. 250-12.) The Family Division dismissed the PINS matter on March 5, 2013. (Def. Richardson's Ex. 11, ECF No. 250-11.)[3] On April 18, 2013, the parties entered into a global consent decree and a Family Division judge entered an order resolving both pending juvenile delinquency matters without requiring Plaintiff Thompson to admit or deny the allegations against him. (*See* Def. Richardson's Ex. 13, ECF No. 250-13.) At a follow-up hearing on May 23, 2013, at which Plaintiffs Russell and Thompson both appeared, the Family Division scheduled a review hearing for July 18, 2013. (Def. Richardson's Ex. 14, ECF No. 250-14.)

On the government's motion, the Family Division scheduled an emergency hearing for June 13, 2013. (Def. Richardson's Ex. 15, ECF No. 250-15.) Because Plaintiff Thompson did not appear at that hearing, the Family Division scheduled a review hearing for June 27, 2013 and directed "that a Pick Up Order will issue" for Plaintiff Thompson. (*Id.*) The Family Division issued an "Order to Take Minor into Custody" ("Pick Up Order") on June 13, 2013. (Def. Richardson's Ex. 16, ECF No. 250-16.) The Pick Up Order directed the Superior Marshal or any deputy to take Plaintiff Thompson into custody and deliver him to the Youth Rehabilitation Center ("YRC"), where he would be held until the review hearing. (*Id.*; Def. Richardson's SMF ¶ 13.) On June 28, 2013, the Family Division issued a second Pick Up Order, ordering Plaintiff Thompson to be taken into custody and detained at the YRC until a review hearing date was scheduled. (Def. Richardson's Ex. 17, ECF No. 250-17; Def. Richardson's SMF ¶ 15.)

As of the morning of July 11, 2013, Plaintiff Thompson had not been picked up. (*See,*

---

[3] It appears that, as of July 11, 2013, Plaintiff Russell did not understand that the PINS matter was terminated in favor of proceeding under the juvenile delinquency matters. (*See, e.g.*, Russell Dep. 23:8–13, ECF No. 250-24 ("I told Paris [sic] that [Plaintiff Thompson] was home and that he was under PINS."); Wong Aff. ¶ 5, ECF No. 250-23 ("Ms. Russell approach [sic] me telling of her frustrations with her son who was a PINS[.]"); Parris Aff. ¶ 3, ECF No. 250-19 ("On July 11, 2013, I was contacted by Deputy Ann Marie Wong regarding a request from Ms. Jamila Russell, to arrest her son, Lauritz Thompson, III, on an outstanding PINS warrant."); *see also* Am. Compl. ¶ 13, ECF No. 22.)

*e.g.*, Pls.' Counterstatement of Material Facts ("CMF") ¶ 6, ECF No. 259; Wong Dep. 6:10–16, ECF No. 250-22.) That morning between 7:00 and 8:00 AM, Plaintiff Russell encountered Deputy Marshal Ann Marie Wong ("Deputy Wong"), in her Marshals uniform, at the Pastry Hut bakery. (*See* Pls.' CMF ¶ 5 (citing a portion of Plaintiff Russell's deposition not produced for the Court);[4] *see also* Wong Dep. 6:2–10, 20–21; Wong Aff. ¶¶ 2–5.) Plaintiff Russell approached Deputy Wong and they engaged in a conversation; Plaintiff Russell informed Deputy Wong that she was concerned about an outstanding pick up order for her son, who had not been picked up, explaining that when she had called police to the house several times before the child had run off and "they were not able to attain the child." (Wong Dep. 6:10–16; *see also* Pls.' CMF ¶ 6 (citing a portion of Plaintiff Russell's deposition not produced for the Court); Wong Aff. ¶¶ 5–6, 9.) Plaintiff Russell conveyed that the pick up order related to her son's PINS matter. (Russell Dep. 23:8–13; Wong Aff. ¶ 5; Parris Aff. ¶ 3.) Deputy Wong "was not familiar with" Plaintiff Russell's son's case at this time. (Wong Dep. 6:10–12.)

Plaintiff Russell testified that, all told, she spoke to Deputy Wong for "well over 20 minutes." (Russell Dep. 24:22.) During this conversation, Plaintiff Russell informed Deputy Wong that she had seen a picture of her son on Instagram posing with a handgun and what appeared to be a marijuana cigarette, or joint, in his mouth. (Wong Aff. ¶ 8; Wong Dep. 7:15–17; *see also* Russell Dep. 17:2–18:20 (noting that she saw the photo on Facebook about a month to six weeks before July 11, 2013, and at that time called the Superior Court to advise them of it); Def. Richardson's SMF ¶ 22.)[5] She also told Deputy Wong that her son had entered her home

---

[4] Plaintiffs' Counterstatement of Material Facts cites to portions of depositions not produced for the Court. (*See, e.g.*, Pls.' CMF ¶¶ 16–42.) It is possible this oversight arose because Defendant Richardson's Motion and exhibits were filed under seal and separately served on Plaintiffs. The Court's factual recitation is based only on record evidence before the Court on these Motions.
[5] It is not clear from the record evidence whether Plaintiff Russell communicated to Deputy Wong on July 11, 2013 when or how recently she had seen the photo on social media.

through a broken window and that there was an inner door she kept locked with a deadbolt so he could not access her or her other minor son. (*See* Wong Dep. 7:8–15; *see also* Russell Dep. 23:15–21 (describing conversation with Deputy Marshal Glenn Parris regarding these facts); Russell Dep. 26:1–22 (describing broken window and locked door).)

Deputy Wong asked Plaintiff Russell to give her a few minutes to verify that the order was in fact outstanding. (Wong Dep. 6:17–19; *see also* Wong Aff. ¶ 10.) First Deputy Wong attempted to call the Family Division, but she was unable to reach anyone there. (Wong Dep. 6:19–22.) Then she called Deputy Marshal Glenn Parris ("Deputy Parris"), who was the Head Marshal in the Family Division, on his cellphone, who verified that there was an outstanding pick up order. (Wong Dep. 6:23–7:4; *see also* Wong. Aff. ¶¶ 11–12.)

Deputy Wong states she spoke to Deputy Parris and conveyed what Plaintiff Russell had explained to her; she asked Plaintiff Russell if she would like Deputy Wong to accompany her to her home; Plaintiff Russell declined and removed a single key from a set of keys, which would give access to her home; and Deputy Wong contacted Deputy Parris again, who agreed to travel to meet Deputy Wong, pick up the key, and retrieve the minor child. (*See, e.g.*, Wong Dep. 7:18–8:9; *see also* Wong Aff. ¶¶ 12–14; Parris Aff. ¶¶ 3, 5–7; *cf.* Parris Dep. 8:3–15, ECF No. 250-18.) Deputy Wong affirms that she took the key and Plaintiff Russell's phone number and met Deputy Parris, when she advised him that Ms. Russell did not want to be present while the pick up order was executed, that her son was in the home and might be sleeping, that he had access to the house via a broken window to the room where he sleeps, and that Deputy Parris should proceed with caution as a result of what Plaintiff Russell had told Deputy Wong "as it pertained to the picture she had seen on the social media." (Wong Aff. ¶¶ 14–17; *see also* Wong Dep. 8:10–17 ("I gave him the single key. I explained to him what the mother had expressed to me

concerning the picture with the handgun, as a sign of precaution. I also handed him a piece of paper with the mother's number and asked him to make contact with the mother before he got to the home."); Parris Aff. ¶ 10.)

Deviating somewhat from Deputy Wong's statements, Plaintiff Russell's testimony suggests that Deputy Wong handed her the phone and Plaintiff Russell spoke directly with Deputy Parris in the presence of Deputy Wong. (*See generally* Russell Dep. 23:8–24:8.) Plaintiff Russell explained to Deputy Parris that she wanted her son, who was under PINS, to be picked up because he was not listening to her; she had seen inappropriate pictures of him;[6] he was presently home, sleeping in his bedroom; and he was locked in the house and had to come in and out through his bedroom window. (*See* Russell Dep. 23:8–21, 24:1–2; *see also* Parris Aff. ¶ 8.) Plaintiff Russell attests that she asked Deputy Parris if he wanted her to meet him at her house, and he declined and told her to give the key to Deputy Wong, and he would go and pick up her son and call her when he had him. (Russell Dep. 23:22–25.) Further, Plaintiff Russell attests that she told Deputy Parris not to go by himself because Plaintiff Thompson was "a runner," and if he saw Deputy Parris pull up and enter through the front door he would run out of the house via the bedroom and "you won't be able to catch him." (Russell Dep. 24:2–6.)

Deputy Parris had been to the house before (Parris Dep. 10:21–25), was aware of the outstanding pick up order (Parris Aff. ¶ 4), and was familiar with the case (Parris Aff. ¶ 7). When he arrived at Plaintiff Russell's house, Deputy Parris noticed that one of the windows was broken, made a check around the house, and called for assistance. (Parris Dep. 11:7–9; Parris Aff. ¶ 11 ("[W]hen I arrived at the residence I realized I was going to need back-up and I

---

[6] Plaintiff Russell attests that she did not tell Deputy Parris about the firearm she thought she saw in the photograph, only that her son was smoking. (Russell Dep. 24:10–14. *But see* Parris Aff. ¶ 9 ("Ms. Russell told me she had seen her son on social media holding a firearm.").)

contacted Deputy Wilbur Francis and Chris St. Claire Richardson for assistance."); *see also* Def. Richardson's SMF ¶ 23 (citing portions of Deputy Parris's deposition not produced for the Court); Pls.' CMF ¶¶ 17–18 (citing other portions of the deposition not produced for the Court).)

Deputy Parris called Defendant Richardson by phone requesting a "43" (immediate assistance) in the execution of an arrest warrant for a juvenile. (Richardson Aff. ¶ 3, ECF No. 250-27.) The call was placed around 7:58 AM. (Richardson Dep. 5:8–9, ECF No. 250-25.) Deputy Parris told Defendant Richardson over the phone that the juvenile, Plaintiff Thompson, was inside the residence and refusing to come out. (Richardson Aff. ¶ 4.) He informed Defendant Richardson that Mr. Thompson "might be armed." (Parris Aff. ¶ 12; *see also* Def. Richardson's SMF ¶¶ 24–25; Richardson Dep. 5:9–14, 5:24–6:25 (discussing fuller conversation regarding possibility that minor was armed, including that Deputy Parris's belief that minor might have a weapon stemmed from the fact that mother reported minor's Facebook posting).) Deputy Parris informed Defendant Richardson that he had planned to grab the minor while the minor was asleep in bed but when Deputy Parris arrived the minor was up and running through the house. (Richardson Dep. 6:2–16.)

Defendant Richardson went into the Marshals' Office to brief his immediate supervisor, Deputy Marshal Carl Yhan. (Richardson Dep. 5:15–17; *see also* Richardson Aff. ¶¶ 5–6.) He grabbed his bulletproof vest (Richardson Dep. 5:17–19) and explained the call (Richardson Aff. ¶ 6; *see also* de Chabert Dep. 7:6–12, ECF No. 250-26). Deputy Marshal Michael de Chabert ("Deputy de Chabert") was also in the Marshals' Office when Defendant Richardson arrived and relayed that Deputy Parris needed assistance with the execution of a PINS warrant. (de Chabert Aff. ¶¶ 3–4, ECF No. 250-28; *see also* de Chabert Dep. 7:8–8:14.) Defendant Richardson informed Deputy de Chabert that Deputy Parris had indicated the juvenile might be armed and

refused to come out of the house. (*Id.* ¶ 5; *see also* de Chabert Dep. 7:1–8:25 (noting that Defendant Richardson continued briefing him on the drive and mentioned that the minor was seen on Facebook with a weapon).)

Deputy de Chabert and Defendant Richardson drove from the Superior Court to Plaintiff Russell's residence; the drive took five to seven minutes. (de Chabert Dep. 8:24–25.) Deputy de Chabert put on his bulletproof vest either in the car or when they arrived, and at that point Defendant Richardson had his on already. (*Id.* 8:22–24; *see also* de Chabert Aff. ¶ 6.) Before they arrived, Deputy Parris observed Plaintiff Thompson attempt to escape through a window located at the rear of the house and unsuccessfully attempted to engage Plaintiff Thompson in conversation and to convince him to come out of the house. (Parris Aff. ¶¶ 13–14.) While traveling, Defendant Richardson "received another call from Deputy Parris requesting their ETA, because he could hear someone running around and rummaging around inside and see him looking through the windows, but [he] would not leave the residence." (Richardson Aff. ¶ 7; *id.* ¶ 8 (noting that he overhead Deputy Parris say "Don't try it!" on this phone call).)

When Defendant Richardson and Deputy de Chabert arrived, Deputy Parris "briefed them on the situation including the possibility that [Plaintiff Thompson] was armed." (Parris Aff. ¶ 15; *see also* de Chabert Dep. 9:15–19.) Deputy Parris gave Defendant Richardson the key to the front door of the home that had been provided by Plaintiff Russell. (Def. Richardson's SMF ¶ 25; Parris Aff. ¶ 16; Richardson Aff. ¶ 9; de Chabert Aff. ¶ 6; *see also* de Chabert Dep. 9:17–18 ("We came out, Marshal Parris said the suspect is inside running from window to window. He throws Marshal Richardson the keys to the home, and me and him proceed to the door.").) At this time, Deputy Wilbur Francis ("Deputy Francis") was also present on the scene. (*See, e.g.*, Parris Aff. ¶ 17; Richardson Aff. ¶ 10; de Chabert Aff. ¶ 7.)

Deputies Parris and Francis covered the northwest and southeast corners of the house while Deputy de Chabert and Defendant Richardson positioned themselves on the front porch in readiness to make entrance through the front door. (Parris Aff. ¶ 17; Richardson Aff. ¶ 10; de Chabert Aff. ¶ 7; Dowling Dep. 6:17–24, ECF No. 257-3.) Defendant Richardson and Deputy de Chabert, in their Superior Court uniforms and bulletproof vests, cautiously approached the front door. (Richardson Aff. ¶ 11.) Defendant Richardson was lead. (*Id.*)

There were two locks on the front door, which opened outward. (de Chabert Aff. ¶ 8.) Defendant Richardson positioned himself to the left side of the front door, nearest the locks and door knob, and Deputy de Chabert positioned himself directly behind him (*id.* ¶ 9), covering the window (de Chabert Dep. 9:19–20) and standing about six feet away from the door (*id.* 10:16–19). Holding the key in his left hand and his court-issued gun in his right hand (Richardson Dep. 24:4–6), Defendant Richardson unlocked one of the locks and used a hand signal to let Deputy de Chabert know he was ready to unlock the second lock (de Chabert Aff. ¶ 10; de Chabert Dep. 9:23–10:4; Richardson Aff. ¶ 12; *see also* Richardson Dep. 22:2–16).

Before Defendant Richardson could open the door, Plaintiff Thompson "burst through the door moving fast toward" Defendant Richardson and Deputy de Chabert. (de Chabert Aff. ¶ 11; *see also* Richardson Dep. 24:7–10 ("the door just bust [sic] open"); Richardson Dep. 34:16–19 ("He came directly towards me. It was quick. Just one abrupt movement directly towards me.").) This whole sequence "happened rather quickly." (Richardson Dep. 34:7–10 ("You know, I got there, I put the key in, unlock it, and the door just bust open. It happened quickly. I can't give an estimate in time. It happened rather quickly.").)

Before Defendant Richardson could announce "Superior Court Marshal" Plaintiff Thompson suddenly burst through the doorway, throwing him off balance. (Richardson Aff.

¶ 13; *see also* Richardson Dep. 24:7–20, 25:10–11 (noting that the door hit him in the upper right portion of his chest, which was covered by his bulletproof vest, and he felt a thump); Richardson Dep. 34:16–25 ("[T]he door hit me, and I was off balance, so I get hit. After I was off balance, I think, you know, it appeared like he was charging towards me. I was in his way.").) At some point, Defendant Richardson moved his finger to the trigger, either while he was unlocking the door or when the door flew back and startled him. (*See* Smith Dep. 18:9–17, ECF No. 250-31.)

Defendant Richardson stated that, in that moment while he was knocked off balance, he feared for his life because he had been informed that Plaintiff Thompson might possibly be armed, so he discharged his court-issued service weapon, striking the juvenile,[7] causing him to fall to the floor. (Richardson Aff. ¶ 14; Richardson Dep. 39:16–25; *see also* Richardson Dep. 24:22–25:11 (repeating that he thought Plaintiff Thompson "had the drop" on him and noting, in a passive construction, "the shot went off" and "then shots were fired" as soon as the door opened); Dowling Dep. 8:1–18 ("[Plaintiff] Thompson surprising him coming through the door, apparently that's what cause [sic] him to discharge his weapon.").) Between the time when the door burst open and when the shots were fired "less than like a millisecond" elapsed. (Richardson Dep. 34:11–15; *see also id.* 24:24–25 ("[T]he door just bust open, and then the shot went off."); de Chabert Dep. 9:25–10:4 ("[T]he door, I guess, as soon as he got the knob – the door lock open, the door – you heard a loud bang, bam. The door pushed out, hitting [Defendant]

---

[7] Defendant Richardson wrote in his affidavit that the bullet hit Plaintiff Thompson's right shoulder. (Richardson Aff. ¶ 14.) Other reports, including Defendant Richardson's statements to others, suggest that Plaintiff Thompson received a gunshot wound to his neck, not his shoulder, resulting in paralysis from the neck down. (*See, e.g.*, Def. Richardson's Ex. 30, ECF No. 250-30; Dowling Dep. 7:14–22 ("The shot that was discharged from [Defendant] Richardson's weapon struck [Plaintiff] Thompson in his neck."); de Chabert Aff. ¶ 14 ("[H]e was bleeding from the neck."); Smith Dep. 9:8–11 (noting that a doctor at Juan Luis Hospital, where Plaintiff Thompson was taken for treatment, told investigating officer Cureene Smith that Plaintiff Thompson was paralyzed); Thompson Dep. 9:19–21, ECF No. 250-34 ("The only thing I remember is someone telling me that I would never walk again and that was it.").)

Richardson, and it was simultaneous, the door hit, gun went off . . . .").)

Deputy de Chabert heard a shot and saw Plaintiff Thompson falling into Defendant Richardson, almost knocking him to the ground. (de Chabert Aff. ¶ 12; *see also* de Chabert Dep. 10:3–8.) Thinking that Defendant Richardson had been shot, Deputy de Chabert immediately fired his weapon at Plaintiff Thompson. (de Chabert Aff. ¶ 13; *see also* de Chabert Dep. 10:3–8 ("I thought he was shot. With hearing the noise, my finger trigger [sic] hit – my weapon went off, hit the hurricane shutter closer to the door, and then the suspect fell forward coming into [Defendant] Richardson's arm, and he placed him on the ground."); Dowling Dep. 9:4–10:13 (discussing what Deputy de Chabert reported to Chief Marshal Darwin Dowling[8]).) Deputy de Chabert then realized there was blood on Plaintiff Thompson and he was bleeding from the neck. (de Chabert Aff. ¶ 14.)

Deputy Parris reported that he heard two gunshots (Parris Aff. ¶ 18), whereas Deputy Francis heard what "sounded like one shot" (Francis Dep. 15:1–7, ECF No. 250-29). (*Cf.* Richardson Dep. 24:25–25:1 ("[T]hen the shot went off. It sounded like one shot or shots fired."); *id.* 25:12–25 (noting that the shots sounded simultaneous to Defendant Richardson, "just one bam").) Deputy Francis arrived at the front porch and applied pressure to Plaintiff Thompson's gunshot wound while Deputy Parris and Defendant Richardson called for immediate assistance from EMTs. (Richardson Aff. ¶ 15; Parris Aff. ¶ 19; *see also* Dowling Dep. 8:21–9:3.) Plaintiff Thompson has no memory of the events of July 11, 2013. (*See* Thompson Dep. 7:16–8:9 ("I just can't remember anything about that day. It's very disturbing to me.").)

On July 29, 2013, Plaintiff Russell sent a letter by certified mail to Governor John de

---

[8] The court notes that this testimony may properly be considered hearsay, as Deputy de Chabert is not a defendant in this action and therefore Federal Rule of Evidence 801(d)(2) does not admit the statements he made to Darwin Dowling. However, Rule 801(d)(2) may apply to the statements Defendant Richardson made to Darwin Dowling and Cureene Smith, cited herein.

Jongh, Jr. of the Government of the United States Virgin Islands. (*See* Pls.' Ex. A, ECF No. 258-1; Pls.' Ex. B, ECF No. 258-2; Pls.' Ex. C, ECF No. 258-3.) The letter aimed to serve as a Notice of Intent to file a claim in accordance with the Virgin Islands Tort Claims Act ("VITCA"), *see* 33 V.I.C. §§ 3409, 3410. It described Plaintiff Thompson's claims for "personal injuries and civil rights violations" based on the fact that he was shot in his home by a Superior Court Marshal who "exercised unnecessary use of force, and caused serious personal injury to [Plaintiff Thompson], a minor." (Pls.' Ex. C.) The Notice of Intent was also served by certified mail on the Honorable Vincent Frazer, Attorney General of the Government of the United States Virgin Islands. (*See* Pls.' Ex. B.) The letter was signed by Plaintiff Russell, on behalf of herself and her minor son, Plaintiff Thompson, and notarized by Emile A. Henderson III. (Pls.' Ex. C.)

Plaintiffs filed this action on July 9, 2015. (ECF No. 1.) The governing Amended Complaint pleads eight counts: (I) Fourth and Fourteenth Amendment violations against Defendant Richardson via 42 U.S.C. § 1983; (II) Negligence against Defendant Richardson; (III) Negligent Supervision/Training against Defendant Superior Court; (IV) Negligent Hiring and Retention against Defendant Superior Court; (V) Vicarious Liability against Defendant Superior Court; (VI) Gross Negligence; (VII) Intentional Infliction of Emotional Distress against Defendant Richardson; and (VIII) Negligent Infliction of Emotional Distress against Defendant Richardson.[9] (*See generally* ECF No. 22.) Defendants Richardson and Superior Court filed motions to dismiss at the end of October 2015. (*See* ECF Nos. 31, 32.) The case was reassigned to Judge Anne E. Thompson on April 4, 2017. (ECF No. 84.) Defendant Government of the Virgin Islands (the "Government") filed a motion to dismiss on April 8, 2017. (ECF No. 88.)

After a hearing on the motions to dismiss (*see* ECF No. 92 (setting hearing date); *see also*

---

[9] Plaintiff designated both Counts III and IV as "Count III" in the Amended Complaint. (ECF No. 22, ¶¶ 32, 36.) The Court re-numbers these Counts and all following in its description.

ECF No. 110 (minute entry for hearing held on May 3, 2017); ECF No. 128 (official hearing transcript)), this Court issued a Memorandum Opinion and Order on May 16, 2017, denying the motions brought by Defendants Richardson and the Government in their entirety and granting in part and denying in part the Superior Court's motion. (ECF Nos. 114, 115.) In particular, the Court determined that Plaintiffs had substantially complied with the VITCA notice requirements with respect to claims arising out of the allegedly negligent or intentional actions in Counts II and V–VIII of Plaintiffs' Amended Complaint. (Mem. Op. at 4, ECF No. 115.) However, the Court dismissed Counts III and IV for lack of notice. (*Id.*) The Court denied Defendant Richardson's assertions of qualified immunity and quasi-judicial immunity on the factual predicate before the Court (*id.* at 5) and declined to consider the Government's argument, raised on reply, that it had not waived its immunity with respect to gross negligence (*id.* at 6).

Defendants Richardson and Superior Court appealed (ECF Nos. 119, 122) but the case was not stayed, instead proceeding to discovery on the question of qualified immunity (ECF Nos. 125, 126, 130). The parties engaged in vigorous discovery, frequently requiring Court intervention. (*See generally* ECF Nos. 131–241.) On July 18, 2018, noting that "proceedings in the District Court have continued during the pendency of this appeal," and that a formal opinion would follow, the Third Circuit issued its judgment, "find[ing] that the interests of the parties and the public are best served by issuing our judgment promptly." *Russell v. Richardson*, 2018 WL 3453371, at *1 (3d Cir. July 18, 2018). The Third Circuit affirmed this Court's May 16, 2017 decision in all respects except as to the gross negligence claim, on which it reversed. (*Id.*)[10]

---

[10] The Court therefore need not entertain Defendants' arguments on gross negligence (*see, e.g.*, Def. Superior Court's Br. at 14, ECF No. 252). Judgment is granted to Defendants Superior Court and the Government on gross negligence (Am. Compl. ¶¶ 47–49). To the extent that Plaintiffs allege gross negligence against Defendant Richardson in his individual or personal capacity, however, sovereign immunity does not apply and this claim survives, subject to reconsideration or revision depending on the forthcoming Third Circuit opinion and mandate.

On June 27, 2018, Defendant Richardson filed his Motion for Summary Judgment. (ECF Nos. 248–50.) Defendant Superior Court filed its Motion for Summary Judgment on June 28, 2018. (ECF Nos. 251, 252.) The Government joined Defendant Superior Court's Motion. (ECF No. 253.) Plaintiffs timely opposed both Motions (ECF Nos. 257, 258) and the moving Defendants replied (ECF Nos. 260, 261). The Court now considers the Motions.

## LEGAL STANDARD

Summary judgment shall be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A dispute is "genuine" if it could lead a "reasonable jury [to] return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it will "affect the outcome of the suit under the governing law." *Id.* When deciding the existence of a genuine dispute of material fact, a court's role is not to weigh the evidence; all reasonable "inferences, doubts, and issues of credibility should be resolved against the moving party." *Meyer v. Riegel Prods. Corp.*, 720 F.2d 303, 307 n.2 (3d Cir. 1983). The court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

The Court must grant summary judgment against any party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. The non-moving party must "point to concrete evidence in the record" that shows the existence of a genuine issue of material fact and may not rely on "mere allegations, conclusions, conjecture, and speculation" to defeat summary judgment. *Abney v. Univ. of the V.I.*, 2016 WL 2349108, at *4 (D.V.I. May 3,

2016). Even where undisputed or unopposed, however, "[w]here the moving party has the burden of proof on the relevant issues, . . . the district court must determine that the facts specified in or in connection with the motion entitle the moving party to judgment as a matter of law." *Anchorage Assocs. v. V.I. Bd. of Tax Review*, 922 F.2d 168, 175 (3d Cir. 1990).

## DISCUSSION

### I. Defendant Richardson's Motion

#### A. Quasi-Judicial Immunity

"As its name suggests, 'quasi-judicial' immunity is a doctrine under which government actors whose acts are relevantly similar to judging are immune from suit. 'Quasi-judicial absolute immunity attaches when a public official's role is "functionally comparable" to that of a judge.'" *Dotzel v. Ashbridge*, 438 F.3d 320, 325 (3d Cir. 2006) (quoting *Hamilton v. Leavy*, 322 F.3d 776, 785 (3d Cir. 2003)). "[T]he official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question. The presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties." *Burns v. Reed*, 500 U.S. 478, 486–87 (1991) (citations omitted).

"[Quasi-judicial] immunity is extended to an official who acts pursuant to a valid court order because the act of enforcing or executing a court order is intrinsically associated with a judicial proceeding." *Banks v. U.S. Marshals Serv.*, 2016 WL 1394354, at *17 (W.D. Pa. Feb. 16, 2016) (internal quotation marks and citations omitted), *report and recommendation adopted*, 2016 WL 1223345 (W.D. Pa. Mar. 24, 2016); *see also Waits v. McGowan*, 516 F.2d 203, 206, 206 n.6 (3d Cir. 1975) (collecting cases). Thus, quasi-judicial immunity may shield law enforcement officers from suit when a plaintiff challenges their routine execution of a facially valid court order. *Perez v. Borough of Berwick*, 2009 WL 1139642, at *5 (M.D. Pa. Apr. 28,

2009) (distinguishing *Lepre v. Tolerico*, 156 F. App'x 522, 525 (3d Cir. 2005)); *see also, e.g.*, *Banks*, 2016 WL 1394354, at *17; *Tilley v. Allegheny Cty. Jail*, 2010 WL 3522115, at *6 (W.D. Pa. Sept. 8, 2010) (finding marshal who took inmate-plaintiff to see nurse at judge's order and transported inmate-plaintiff to U.S. courthouse, causing delay in inmate-plaintiff's medical treatment, was entitled to quasi-judicial immunity for executing court orders); *Maldonado v. New York Cty. Sheriff*, 2006 WL 2588911, at *5 (S.D.N.Y. Sept. 6, 2006) ("[P]ersons who faithfully execute valid court orders are absolutely immune from liability for damages in actions challenging conduct authorized by the order." (quoting *Wilkinson v. Russell*, 973 F. Supp. 437, 440 (D. Vt. 1997))).

It is undisputed that Deputy Parris told Defendant Richardson to report to Plaintiff Russell's home to assist in executing a juvenile arrest warrant. Further, the record shows there was an outstanding pick up order from the Family Division. Nevertheless, Defendant Richardson's assertion of quasi-judicial immunity is misplaced. Plaintiffs do not claim that taking Plaintiff Thompson into custody was wrongful. For example, had Plaintiff Thompson complained of false arrest or false imprisonment, quasi-judicial immunity might attach because Defendant Richardson was executing a facially valid family court pick up order. But the facts before the Court are different. *See Perez*, 2009 WL 1139642, at *5 ("Here, the defendants took a routine bench warrant for a non-violent offender who missed a hearing, and imprudently decided to use that as justification for a middle of the night raid involving twelve officers, including ICE agents. . . . [W]e will not extend absolute immunity to defendant Panetta in this situation."). Based on the totality of the facts, quasi-judicial immunity is inapposite and inapplicable. Defendant Richardson has presented no convincing argument why the Court should extend the policy underscoring absolute immunity to these circumstances or disturb the presumption that

qualified immunity applies instead. *Burns*, 500 U.S. at 486–87; *Light v. Haws*, 472 F.3d 74, 80–81 (3d Cir. 2007) (citing *Forsyth v. Kleindienst*, 599 F.2d 1203, 1212 (3d Cir. 1979)). Summary judgment is denied on this basis.

### B. Qualified Immunity

When engaged in discretionary functions, "qualified immunity shields government officials from civil liability as long 'as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *McGreevy v. Stroup*, 413 F.3d 359, 364 (3d Cir. 2005) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). A court must first determine what right was violated, and, second, whether the right specifically defined was clearly established such that "every reasonable official would have understood that what he [was] doing violates that right." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015). Further, while "qualified immunity is an objective question to be decided by the court as a matter of law," it is up to the jury to "determine[] disputed historical facts material to the qualified immunity question." *Carswell v. Borough of Homestead*, 381 F.3d 235, 242 (3d Cir. 2004); *see also Curley v. Klem*, 298 F.3d 271, 278 (3d Cir. 2002).

The Amended Complaint here alleges excessive force (Am. Compl. ¶¶ 16–17), in violation of the Fourth and Fourteenth Amendments to the U.S. Constitution (*id.* ¶¶ 24–26).[11] "It is clearly established that if a[n] individual does not present a danger to the officers present or others, law enforcement officials violate that individual's Fourth Amendment rights by shooting [] him or her with a firearm." *Zion v. Nassan*, 727 F. Supp. 2d 388, 402 (W.D. Pa. 2010) (citing *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)); *see also Thompson v. Howard*, 679 F. App'x 177,

---

[11] "[T]he Fourth Amendment, 'not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.'" *Davenport v. Borough of Homestead*, 870 F.3d 273, 279 (3d Cir. 2017) (quoting *Graham v. Connor*, 409 U.S. 386, 395 (1989)), *cert. denied*, 138 S. Ct. 1263 (2018).

181 (3d Cir. 2017) (citing *Abraham v. Raso*, 183 F.3d 279, 289 (3d Cir. 1999)). Reasonableness is the touchstone of an excessive force analysis and therefore highly pertinent to qualified immunity here. *See, e.g.*, *Zion*, 727 F. Supp. 2d at 398 n.5. "Use of excessive force is an area of the law 'in which the result depends very much on the facts of each case[.]'" *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (quoting *Mullenix*, 136 S. Ct. at 309); *see also Santini v. Fuentes*, 795 F.3d 410, 417 (3d Cir. 2015) (listing factors for totality of the circumstances approach to evaluate objective reasonableness of use of force).

As did *Tennessee v. Garner*, this case concerns an officer's shooting of an unarmed fifteen-year-old. Unlike Edward Garner, though, Plaintiff Thompson was not in the process of committing a felony when he was apprehended and shot by an officer on the scene; rather, his mother requested that Marshals go to her home pursuant to an outstanding family court pick up order for her son, giving notice that he "was a runner." Against this backdrop, the key questions for the first prong of the qualified immunity analysis, *i.e.* whether there was a Fourth Amendment violation, are (1) what actions Defendant Richardson took and (2) whether those actions were reasonable in view of the totality of the circumstances.

Genuine disputes of material fact pervade the summary judgment record. For example, it is not clear whether Defendant Richardson believed that Plaintiff Thompson *might be* armed on the basis of a weeks-old social media post, *was* armed and dangerous, or *had weapons* in the house when he and Deputy de Chabert arrived at the scene.[12] Further, it is undisputed that the

---

[12] The record evidence inconsistently suggests that the responding deputy marshals understood that the minor *was* "armed and dangerous" and/or *had* "weapons," as opposed to that he *might be* armed with *a* weapon based on his mother's report of a social media photograph. (*Compare, e.g.*, Richardson Dep. 5:18 ("[T]he information that I received was that this juvenile had weapons in the house."), *and* de Chabert Dep. 7:9–12 ("[O]n the way down, he was briefing me that – I believe he spoke to Marshal Parris. He stated . . . the guy was armed and dangerous. I think he believed he had a gun."), *with* Richardson Aff. ¶ 14 ("I had been informed that Mr. Thompson might possibly be armed[.]"), *and* de Chabert Aff. ¶ 5 ("Deputy Richardson informed me that

sequence of events was very quick from the time Defendant Richardson and Deputy de Chabert approached the front door to when Plaintiff Thompson was on the floor bleeding from his neck. (*See* Def. Richardson's SMF ¶ 31; Pls.' Resp. to Def. Richardson's SMF ¶ 31.) However, perhaps in part due to the rapid nature of the events, the sequence is murky. Defendant Richardson's testimony suggests the door burst open, hit him, and knocked him off balance; Plaintiff Thompson started running or charging in his direction; Defendant Richardson was in fear for his life; and Defendant Richardson intentionally shot Plaintiff Thompson. (*See, e.g.*, Richardson Dep. 24:7–25:11, 34:16–25, 39:16–25; Richardson Aff. ¶¶ 13–14.) But other record evidence suggests the door burst open, hit Defendant Richardson, and knocked him off balance; Defendant Richardson was startled; Defendant Richardson shot in Plaintiff Thompson's direction; and Plaintiff Thompson came falling through the doorway. (*See, e.g.*, de Chabert Dep. 9:25–10:4; Dowling Dep. 8:1–18 (describing conversation with Defendant Richardson); de Chabert Aff. ¶¶ 11–12; *see also generally* Pls.' Resp. to Def. Richardson's SMF ¶¶ 26–31.)[13]

By one account, Plaintiff Thompson was charging or running before Defendant Richardson fired; by another, Defendant Richardson fired as soon as the door knocked him off balance, and Plaintiff Thompson fell through the doorway as or after the bullet entered his body.

---

Deputy Parris had indicated that the juvenile we were trying to arrest might be armed and refused to come out of the house.").) The Court notes that depositions in this case were taken in the spring of 2018, whereas the affidavits were signed in July 2017.

[13] Defendant Richardson argues "[i]t is also undeniable that Thompson's own actions were the direct proximate cause of his injuries and that whether his intent was to flee or attack the Deputies, his headlong charge into [Defendant] Richardson from behind a closed door constituted active resistance to being taken into custody." (Def. Richardson's Br. at 12.) This line of argument was rejected by the U.S. Supreme Court in *Tennessee v. Garner* more than thirty years ago. *See* 471 U.S. at 5 (noting that defendants argued "Garner had 'recklessly and heedlessly attempted to vault over the fence to escape, thereby assuming the risk of being fired upon.'"); *id.* at 21 ("Officer Hymon could not reasonably have believed that Garner—young, slight, and unarmed—posed any threat. Indeed, Hymon never attempted to justify his actions on any basis other than the need to prevent an escape."). Attempted flight or resisting arrest is but one factor for analyzing the reasonableness of the use of force. *See Santini*, 795 F.3d at 417.

These facts—whether Defendant Richardson reasonably believed Plaintiff Thompson was or might be armed, what he observed Plaintiff Thompson doing once the door swung open, and why he fired his weapon (i.e. in fear versus from being startled by the door)[14]—are critical to the Fourth Amendment analysis, precluding summary judgment on qualified immunity.

## II. Defendant Superior Court's Motion

### A.  Sovereign Immunity under the Virgin Islands Tort Claims Act ("VITCA")

The VITCA constitutes a waiver of sovereign immunity otherwise enjoyed by the Government with respect to liability for personal injury caused by the negligent or wrongful conduct of a Government employee acting within the scope of their employment. 33 V.I.C. § 3408; *see also id.* § 3401 (encompassing the Superior Court and its officers and employees). Pursuant to the VITCA, a Plaintiff must file a claim, or a notice of intention to file a claim, against the government within ninety days after accrual of the claim. *Id.* § 3409(c). If a notice of intention is filed, the claim itself must be filed within two years after accrual of the claim. *Id.* The claim must be served on the Governor and the Attorney General. *Id.* § 3410. The Virgin Islands Supreme Court has noted, "substantial compliance with the statute is all that is required. If the [notice] is sufficiently definite to inform the officers of the state of the time and cause of claimant's injuries or damages, it should be upheld." *Brunn v. Dowdye*, 59 V.I. 899, 910 (2013) (alteration in original) (citing *Pickering v. Gov't. of the V.I.*, 19 V.I. 271, 277 (D.V.I. 1982)).

> [W]here a complaint is timely filed under the Tort Claims Act with the proper parties having been served and contains all of the necessary substantive requirements—which include a statement as

---

[14] Only one piece of record evidence, which may be hearsay, characterizes the shooting as wholly accidental. (*See* Def. Richardson's Ex. 30.) The Court notes that courts in the Third Circuit have found accidental law enforcement shootings are beyond the reach of the Fourth Amendment. *Clark v. Buchko*, 936 F. Supp. 212, 218–20 (D.N.J. 1996) (collecting cases); *Troublefield v. City of Harrisburg*, 789 F. Supp. 160, 162–66 (M.D. Pa. 1992) (collecting cases), *aff'd* 980 F.2d 724 (3d Cir. 1992); *see also, e.g.*, *Williams v. Healy*, 2015 WL 2185577, at *5 (D.N.J. May 8, 2015); *Brice v. City of York*, 528 F. Supp. 2d 504, 510–11 (M.D. Pa. 2007).

> to when the claim arose, a statement as to where the claim arose, a statement as to the nature of the claim and items of damage or injuries as well as the sum claimed, and a verification—the complaint suffices as a "claim" under the meaning ascribed to that term in the Tort Claims Act.

*Albert v. Abramson's Enters., Inc.*, 790 F.2d 380, 383 (3d Cir. 1986); *see also Pickering*, 19 V.I. at 277 (noting that claimant who files timely notice of intention and thereafter files a related lawsuit within the two-year limitations period may seek leave of the court to have that notice deemed a claim within the meaning of the VITCA).

At the motion to dismiss stage, this Court held "Plaintiffs have sufficiently complied with the VITCA with respect to the claims arising out of the allegedly negligent or intentional actions contained in Counts II and V–VIII." (Mem. Op. at 4.) Plaintiffs had filed letters on July 29, 2013, served on the Governor and Attorney General, sufficiently describing the conduct at issue, injuries suffered, and claims asserted based on the July 11, 2013 incident, signed by Plaintiff Russell on behalf of herself and her minor son, Plaintiff Thompson, and notarized. (*See* Pls.' Exs. A–C.) Further, Plaintiffs filed this civil lawsuit on July 9, 2015, within two years of accrual of their claims. At summary judgment, Defendants restyle their argument as one concerning exhaustion of administrative remedies, asserting that even if Plaintiffs satisfied the statutory notice of intent requirement, Plaintiffs "have never filed a claim." (Def. Superior Court's Br. at 3, ECF No. 252 (emphasis omitted).)[15] In essence Defendants argue that the filing of this lawsuit

---

[15] To the extent Defendants ask the Court to reconsider its earlier holding finding that the Notice of Intent was sufficient (*see, e.g.*, Def. Superior Court's Br. at 4 ("[T]he 'Notice of Intent', in and of itself, is inadequate and not in compliance with the requirements of the Act."); *id.* at 5–12), reconsideration is denied. Neither the Superior Court nor the Government can convincingly argue that they lacked notice—the primary policy behind the VITCA's threshold administrative hurdles. Defendants' assertion that Plaintiffs' "failure to make a reference to any negligent or intentional acts by Chris Richardson did not afford the Government an opportunity to make an investigation," fails to persuade the Court, especially given that one of Defendant Richardson's own exhibits is the resulting "Investigative Report" from an investigation conducted by the Special Investigations Division of the Government's Department of Justice, dated August 5,

within the two-year time limit does not satisfy the independent obligation to file an administrative claim. Longstanding Third Circuit precedent dictates otherwise. *See, e.g.*, *Albert*, 790 F.2d at 383; *see also Pickering*, 19 V.I. at 277. In addition to timely filing a Notice of Intent that substantially complied with the VITCA's requirements and was personally signed by Plaintiff Russell on behalf of herself and her then-minor son, Plaintiff Thompson, Plaintiffs timely filed their complaint in this action, serving the proper parties, and containing all the necessary substantive requirements: when and where the claim arose (Compl. ¶¶ 10–12, ECF No. 1), the nature of the claim (*id.* ¶¶ 13–14, 23–30, 41–52), the nature of the damages (*id.* ¶¶ 15–18), signed by Plaintiffs' attorney.[16] "[T]he government cannot be said to have been hampered in its investigatory pursuit in the case or in its assessment of liability." *Albert*, 790 F.2d at 383. Indeed, the Government conducted its own investigation of this incident which concluded by August 5, 2013. (Def. Richardson's Ex. 30; *see also supra* note 15.) Defendant Superior Court's assertion of sovereign immunity, joined by the Government, does not bear out, and summary judgment is denied on this basis.

---

2013. (*See* Def. Richardson's Ex. 30.) Not only did the Government have an opportunity to make an investigation, it made one and issued an "Investigative Report" within one month of the incident in question, and just days after Plaintiffs mailed their Notice of Intent. The Court rejects Defendants' untimely request for reconsideration.

[16] Though Defendants argue that personal verification is an obligation that cannot be waived (*see* Def. Superior Court's Br. at 11–12), the Court finds that the signed Notice of Intent coupled with the filing of a civil complaint signed by Plaintiffs' attorney amounted to substantial compliance with the verification requirement. The cases Defendants cite note that an unverified complaint should not be dismissed, since "[t]he better course would be to allow plaintiff to supplement the complaint [or notice of claim] with a verification." *McBean v. Gov't of the V.I.*, 19 V.I. 383, 386 (V.I. Terr. Ct. 1983) (quoting *Henry v. Gov't of the V.I.*, 10 V.I. 227, 228 (D.V.I. 1973)). At this stage of the litigation, both Plaintiffs have already given sworn testimony verifying the facts of this case. To grant summary judgment against them on what amounts to a technicality at this juncture would work tremendous prejudice. Based on the totality of the facts and circumstances before the Court, the verification requirement is substantially met.

### B. Qualified Immunity

Defendants Superior Court and the Government argue that "a finding of qualified immunity . . . in favor of [Defendant] Richardson . . . will entitle him and the Superior Court to Summary Judgment on Counts II, [VII], and [VIII]. . . [and] entitle the Government to Summary Judgment on Count IV." (Def. Superior Court's Br. at 13 (Counts renumbered by the Court).) Defendants likewise assert entitlement to summary judgment on Plaintiffs' claim for vicarious liability (Count V) if the Court were to find Defendant Richardson immune from liability. Having fully evaluated Defendant Richardson's immunity arguments and denied summary judgment on that basis, *supra* Part I, the Court denies summary judgment to Defendants Superior Court and the Government premised on Defendant Richardson's claimed immunity.

### C. Substantive Claims

Defendant Superior Court's final arguments are premised on Plaintiffs' failure to "make out a cause of action" for negligence (Def. Superior Court's Br. at 13–14), intentional infliction of emotional distress (*id.* at 15), and negligent infliction of emotional distress (*id.* at 16–17). Defendants do not refer to record evidence, instead arguing that Plaintiffs' allegations in the Amended Complaint fail to state a claim. (*See, e.g.*, *id.* at 16 ("Plaintiffs' allegations in Count [VIII] do not state a claim for negligent infliction of emotional distress.").)[17] With respect to negligence, Defendants assert that Plaintiffs have not alleged or demonstrated that Defendant Richardson owed Plaintiff Thompson a duty of care, breached said duty, or proximately caused Plaintiff Thompson's harm. As fully elucidated in section I.B., *supra*, whether Defendant Richardson acted unreasonably and breached his duty of care as a law enforcement officer involves genuinely disputed issues of material fact. The Court finds that Plaintiffs' claims for

---

[17] The Court presumes Defendants mean to argue that there are no genuinely disputed material facts and they can be awarded judgement as a matter of law, the standard on summary judgment.

intentional and negligent infliction of emotional distress likewise depend on the resolution of disputed facts outlined in Part I.B., *supra*. Therefore, summary judgment is denied.

## **<u>CONCLUSION</u>**

For the reasons stated herein, Defendant Richardson's Motion is denied and Defendant Superior Court's Motion is granted in part and denied in part. An appropriate order will follow.


Date:  <u>August 13, 2018</u>                    <u>*/s/ Anne E. Thompson*</u>
                                    ANNE E. THOMPSON, U.S.D.J.